THE HONORABLE ____________

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

**MARK HAYES**, an individual,

Plaintiff,

v.

**MARCHEL AUSTIN ZELAN**, also known as AUSTIN ZELAN, "DR. AUSTIN ZELAN," MARCEL ZELAN, and MARCHEL ZAGREBELNY, individually, and **YELYZAVETA CHERNIIENKO ZELAN**, also known as ELIZABETH ZELAN, and the marital community composed of them;

**SEAN CONLEY**, individually;

**ZELAN CONSULTING LLC**, a Washington limited liability company;

**CASHFLOWPRENEURS LLC**, a Washington limited liability company, administratively dissolved;

**WESTGATE FUND GROUP, OVERSEER AND HIS SUCCESSORS, A CORPORATION SOLE**, a Colorado corporation sole;

**ALPHANANCE GLOBAL, OVERSEER AND HIS SUCCESSORS, A CORPORATION SOLE**, a Colorado corporation sole;

**ALPHA GLOBAL TRUST, OVERSEER AND HIS SUCCESSORS, A CORPORATION SOLE**, a Colorado corporation sole;

**LIBERTY ONE ALLIANCE, OVERSEER AND HER SUCCESSORS, A CORPORATION SOLE**, a Colorado corporation sole;

**TANYA ZELAN**, also known as TONYA ZELAN, as Relief Defendant;

Case No.: ______________________

# COMPLAINT FOR SECURITIES FRAUD, CIVIL RICO, FRAUD, AND RELATED CLAIMS

***(Securities Act §§ 12(a)(1), 12(a)(2); Exchange Act § 10(b) and Rule 10b-5, § 20(a); RICO 18 U.S.C. §§ 1962(c), (d); Washington State Securities Act; Washington Consumer Protection Act; Fraud; Negligent Misrepresentation; Breach of Fiduciary Duty; Unjust Enrichment and Constructive Trust; Fraudulent Transfer, RCW 19.40)***

## JURY TRIAL DEMANDED



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

**JOHN ZELAN**, as Relief Defendant;

**YELYZAVETA CHERNIIENKO ZELAN**, individually, as Relief Defendant;

**THE MONEGASQUE LLC**, a Florida limited liability company, as Relief Defendant; and

**DOES 1 through 10**,

Defendants.

Plaintiff Mark Hayes, by and through his undersigned counsel, brings this Complaint against the above-named Defendants and alleges as follows. Allegations concerning Plaintiff's own acts are made on personal knowledge. All other allegations are made on information and belief, formed after an investigation that included public filings, bank records, Defendants' own written statements, and documents in the possession of Plaintiff's counsel.

## I. INTRODUCTION

1. This is a securities-fraud and racketeering case about a man who sells pieces of airplanes and exotic cars he does not own, spends the money on himself, his family, and the people who brought him the last investor, and then stalls until the victim gives up or a new investor arrives to be "replaced" into the position. His name is Marchel Austin Zelan. He calls himself "Dr. Austin Zelan." He has done this to many people. This case is about what he did to Mark Hayes.

2. Mark Hayes is 61 years old, partially paralyzed on his right side, and living on a medical-malpractice settlement that was meant to pay for the rest of his care. Over four years, Zelan cultivated him: a TEDx stage in Georgia in 2021, then telephone calls and social-media messages, then a $40,000 "Equity Boardroom" program in October 2025 whose real purpose was to learn how much money Hayes had and where it was. Two weeks after Hayes signed, Zelan emailed him that "$398k" would buy "25% of the Pilatus," that Zelan would "personally own 50% of this plane," that he had "just spoke[n] with Saad (our CEO)," and that closing was "scheduled for Nov 24th." Hayes wired $448,000 on November 14, 2025 for the airplane and a share of a Lamborghini Urus.



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

3. There was no closing. Zelan owned no part of the airplane. He was not part of its operator's management. The operator's principal regards Zelan as having defaulted on a letter of intent in 2023. Not one dollar of Hayes's money went to the aircraft, its operator, or anyone connected with it.

4. Zelan has since admitted in writing where the money went. Within seven weeks, roughly $221,085 was wired out to seven people whose names he refuses to disclose; $35,000 went to his former Vice President of Sales, Sean Conley; roughly $62,000 reinstated the defaulted mortgage on Zelan's own beach house in St. Pete Beach, Florida; roughly $80,000 went to what he calls "advertising, marketing, and travel" in the weeks around his wedding; and $70,000 went to cure his personal default on the Lamborghini's loan, a car financed in his own name since 2022. Zelan first swore that the entire $398,000 had gone to the seven "participants." When Hayes demanded the wire records, Zelan corrected the figure by $176,915.

5. That is the structure of a Ponzi scheme: new money pays old obligations and the operator's living expenses, and no investment ever earns anything. When Hayes demanded his money back in February 2026, Zelan did not offer to sell the airplane or draw on its income, because there was neither. He wrote that he was "[l]ooking for people to replace your position in the jet," asked whether Hayes knew anyone who could replace "$50k? $100k?" of it, said "[t]hey can wire the money directly to you actually," and sent a webinar link as "the fastest route to get your position replaced."

6. It is also the structure of what law enforcement now calls "pig butchering": a long period of cultivation and trust-building, a small first payment, a large second payment into an asset that exists only in the seller's description, and a sales team paid from the proceeds for delivering the victim. Hayes was cultivated for four years, paid $40,000 to enter the pen, and was then sold an airplane.

7. Zelan did not act alone. He ran the operation through a Washington limited liability company that received the wires, a dissolved Washington company whose name is on the program contract, and four Colorado "corporations sole," a corporate form reserved by law for the head of a church, which publish no officers and whose bank accounts, by Zelan's own account, his mother



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

controls. He married two days before Hayes's first wire. Four months after the second wire, his wife formed a Florida company at his Washington business address and, within six months, launched a licensed edition of a Monaco luxury magazine under her name as Editor in Chief, while Zelan was telling Hayes he could not afford to pay more than $3,000 a month.

8. Hayes's loss is $491,579.68. He has been repaid nothing. He brings this action under the Securities Act of 1933, the Securities Exchange Act of 1934, the Racketeer Influenced and Corrupt Organizations Act, the Washington State Securities Act, the Washington Consumer Protection Act, and Washington common law, for rescission, treble damages of $1,474,739.04, attorneys' fees, and a constructive trust over every asset into which his money can be traced, in Washington, Florida, or anywhere else.

## II. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Securities Act of 1933, the Securities Exchange Act of 1934, and 18 U.S.C. §§ 1962 and 1964; under 15 U.S.C. § 77v and 15 U.S.C. § 78aa; under 18 U.S.C. § 1964(c); and under 28 U.S.C. § 1367 over the state-law claims, which arise from the same transactions. Jurisdiction also exists under 28 U.S.C. § 1332: Plaintiff is a citizen of Georgia, no Defendant is a citizen of Georgia, and the amount in controversy exceeds $75,000.

10. This Court has personal jurisdiction over Zelan, who is domiciled in Renton, King County, Washington, and over the marital community, whose business was conducted from Washington. It has personal jurisdiction over Zelan Consulting LLC and Cashflowpreneurs LLC, both organized under Washington law with their offices in this District; over the four corporation-sole Defendants, each of which designates a Renton, Washington address and each of which was formed and used by a Washington resident to do business from Washington; over Sean Conley, who sold for a Washington enterprise and received Hayes's funds from a Washington company's bank account; over The Monegasque LLC, which designates a Renton, Washington mailing address and is owned by a member of a Washington marital community; and over all Defendants under 18 U.S.C. § 1965.



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

11. Venue is proper under 28 U.S.C. § 1391(b)(1) and (2), 15 U.S.C. § 77v(a), 15 U.S.C. § 78aa, and 18 U.S.C. § 1965(a). Zelan resides in King County; every representation to Hayes was made from King County; and Zelan's own program agreement selects Washington law and a Washington forum. Under Local Civil Rule 3(e), this case is properly assigned to the Seattle Division.

## III. PARTIES

### A. Plaintiff

12. Plaintiff Mark Hayes is a citizen of Georgia residing in Dacula, Gwinnett County, Georgia. He operates a small consulting business. He is not an investment professional and has no training in aviation finance, aircraft ownership, exotic-vehicle leasing, or securities. He is 61 years old, partially paralyzed on his right side, in chronic pain, and dependent on a medical-malpractice settlement for his future care. The money he gave Defendants came from that settlement.

### B. Defendant Zelan and the Marital Community

13. Defendant Marchel Austin Zelan, also known as Austin Zelan, "Dr. Austin Zelan," Marcel Zelan, and Marchel Zagrebelny, is an individual domiciled in Renton, King County, Washington, who also maintains a residence at 451 81st Avenue, St. Pete Beach, Florida. He made every representation described in this Complaint and received or directed every dollar Hayes transferred.

14. Defendant Yelyzaveta Cherniienko Zelan, also known as Elizabeth Zelan, is Zelan's spouse. They married on November 1, 2025, two days before Hayes's first wire. Every act alleged in this Complaint occurred during the marriage and in the conduct of the business from which the marital community derives its income. Under RCW 26.16 and deElche v. Jacobsen, 95 Wn.2d 237 (1980), the obligations alleged here are community obligations. Every Count asserted against Zelan is asserted against the marital community composed of Zelan and Ms. Zelan, and judgment is sought against the community and its property. Ms. Zelan is also named in her individual capacity as a Relief Defendant, as described below.



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

**C. Defendant Conley**

15. Defendant Sean Conley is an individual whose residence is presently unknown to Plaintiff. He served as Vice President of Sales for Zelan's operation, soliciting and closing program participants and investors. In or after December 2025 he received $35,000 of Hayes's money from Zelan Consulting LLC's Bank of America account. Zelan has described that payment as repayment of a "debt." Plaintiff alleges, on information and belief, that it was compensation for Conley's role in the enterprise's sales operation, including the cultivation and delivery of investors such as Hayes.

**D. The Entity Defendants**

16. Defendant Zelan Consulting LLC is a Washington limited liability company (UBI 605 356 758) with its office at 15325 SE 155th Place, Unit Y4, Renton, Washington, Zelan's residence. Its Bank of America accounts received the $40,000 wire on November 3, 2025, the $448,000 wire on November 14, 2025, and the two Zelle payments in January 2026. Zelan is its sole governor.

17. Defendant Cashflowpreneurs LLC is a Washington limited liability company (UBI 604 978 395) that was administratively dissolved on March 3, 2025, seven months before its trade name, "Cashflowpreneur," was placed on the $40,000 program agreement Hayes signed. Its registered agent of record is "TANYA Z," Zelan's mother.

18. Defendants Westgate Fund Group, Overseer and His Successors, a Corporation Sole (Colorado ID 20211333521); Alphanance Global, Overseer and His Successors, a Corporation Sole (Colorado ID 20201583348); Alpha Global Trust, Overseer and His Successors, a Corporation Sole (Colorado ID 20171291923); and Liberty One Alliance, Overseer and Her Successors, a Corporation Sole (Colorado ID 20201972350), are Colorado corporations sole, each designating a Renton, Washington address. A corporation sole is a statutory form by which the head of a religious body holds church property; it has no directors, publishes no officers, and files no ownership disclosure. Washington abolished the form for new filings in 2009. None of these four has any located church, congregation, charity registration, or exempt-organization record. Two are named "Fund" and "Trust." They supplied the enterprise with bank accounts, mail


ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

domains, and signature blocks that no public record connects to any human being. The "Overseer" of the first three is Zelan; the fourth names a female Overseer and, on Zelan's own account, its accounts are controlled by his mother.

19. Defendants Does 1 through 10 are persons and entities presently unknown who participated in, received proceeds of, or hold assets of the scheme, including the seven recipients of the December 2025 wires, the persons doing business as "Equity Boardroom" and "Zelan Aviation," and others who solicited investors. Plaintiff will amend to name them when identified.

**E. The Relief Defendants**

20. Relief Defendants Tanya Zelan, also known as Tonya or Tatyana Zelan, and John Zelan are Zelan's parents and residents of King County, Washington. By Zelan's own written account, his mother controls the bank accounts of Liberty One Alliance, Alpha Global Trust, and an affiliate styled Alpha Global Corp., and in 2026 caused payments from those accounts to him. She is the registered agent of Cashflowpreneurs LLC. Plaintiff alleges on information and belief that investor funds, including funds traceable to Hayes, have passed through accounts his parents hold or control.

21. Relief Defendant Yelyzaveta Cherniienko Zelan, individually, and Relief Defendant The Monegasque LLC, a Florida limited liability company (Document No. L26000162961) formed March 19, 2026 with its principal office in St. Petersburg, Florida and its mailing address at Zelan's Renton business address, are named because, on information and belief, they hold property and accounts funded in whole or in part with money traceable to Hayes, for which neither gave value.

22. The Relief Defendants are named only on Counts XII and XIII. Plaintiff does not allege that any Relief Defendant, in that capacity, made any representation to him. The relief sought against them is a constructive trust, an equitable lien, an accounting, avoidance of transfers, and an injunction against dissipation. Ms. Zelan's separate exposure as a member of the marital community is not limited by this paragraph.



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

## IV. FACTS

### A. The Zelan Operation

23. Zelan markets himself to the public as "Dr. Austin Zelan," a "TEDx Speaker," a former Microsoft consultant, a holder of a master's degree in business, and an investor whose operation "has generated $20M+ in Passive Income." No public record supports any of it. No institution, degree, or dissertation has been identified for the doctorate; the only credential located is a member profile at a $175-enrollment online ministry school at which he sought a master's degree and listed his "five-fold ministry" office as "Apostle." A TEDx event is a locally licensed event, not a TED conference, and no one audits its speakers' financial claims. The articles he circulates under the Forbes name appear on a licensed foreign edition and, on information and belief, were placed on his behalf. No employer record, regulator, or independent source corroborates the Microsoft career or the degree.

24. The operation is a funnel. At the top is public content: videos and social-media posts of automobiles, aircraft interiors, resorts, and events. In the middle is a paid program sold as "Cashflowpreneur" and "Equity Boardroom," priced in tiers up to $40,000, whose contract identifies the seller only as "Cashflowpreneur" and conceals the dissolved LLC behind the name. At the bottom is a private "opportunity" requiring a large wire to Zelan Consulting LLC. The program's real function is intelligence: it puts Zelan in private contact with a person who has just proved he has liquid capital, and it teaches Zelan how much more there is, where it came from, and what the person wants it to do.

25. The returns were promised in writing. On or about September 28, 2022, posting as "Austin Zelan | ADMIN" on his members' platform, Zelan wrote that the "[t]arget is 5-10% per month" with a "50/50 profit split." In November 2022, investor wire instructions directed funds to the Bank of America account of Alphanance Global, a corporation sole, and the investor was designated a "Silent participant" in a "Westgate Fund" instrument. That investor received nothing and, when he asked for his money back, was told in writing, "We don't do refunds." These facts are pleaded on information and belief based on documents in Plaintiff's counsel's possession.

26. The program also supplied the financing. The members' platform included a module called "Express Funding" and a standing session called "Credit Tuesdays." When a lender declined a prospect, sales staff instructed him to raise his card limits and to state his income to the issuers at a figure "high enough to increase limits, but low enough where it doesn't trigger any red flags with creditors." Plaintiff pleads this as part of the scheme and as evidence that Defendants knew their customers could not afford what they were sold.

27. The interests Zelan sells are registered nowhere. No registration statement or Form D exists for Zelan, Westgate Fund, Alphanance, or Cashflowpreneur; nothing is registered with the Washington Department of Financial Institutions; and Zelan is not and never has been a registered broker, dealer, agent, or investment adviser.

28. Zelan has been sued for this before. On June 12, 2023, an investor filed Cupceanu v. Zelan, No. 2:23-cv-00881-LK, in this Court, alleging securities fraud in the sale of the same categories of product through a "minimum buy-in" rising to "$40,000 for the quickest returns," credit-card financing arranged by the sellers, and a false promise that "the Zelan organization will invest side by side its own money." The case was voluntarily dismissed within two months; the Court denied a motion to seal the complaint. Zelan has resolved claims by other investors through written settlement agreements that, on information and belief, are typically honored for a few installments and then abandoned. Plaintiff's counsel has represented several of those investors and has been contacted by others.

29. Since at least 2022, then, Zelan has known that his products are alleged to be unregistered securities sold by fraud, has known that his investors receive nothing, and has kept selling.

**B. Hayes Is Recruited**

30. Hayes first encountered Zelan at a TEDx event in Woodstock, Georgia, on or about November 21, 2021. From then until the fall of 2025, Zelan stayed in contact with him by telephone and social-media messaging. Hayes told Zelan about his medical-malpractice settlement, his disability and limited earning capacity, and his hope to build a business that could employ his son. Zelan represented, repeatedly and in substance, that he personally owned income-producing

aircraft and exotic automobiles that earned high rental and charter returns, that he had achieved those results for others, and that he could place Hayes into the same positions.

31. On or about October 20, 2025, Zelan presented Hayes with a form "Equity Boardroom Sales Agreement" dated "as of" October 14, 2025. Section 1 states: "Cashflowpreneur hereby sells to Client the goods and services comprising the Cashflowpreneur Equity Boardroom ('Program'). Client agrees to pay for the Program via wire transfer of $40,000.00 upon acceptance." Section 3(a) promises "[a]ccess to exclusive opportunities with Austin," twice-monthly calls "to learn about alternative asset investing and financial literacy," and the "[o]pportunity to build a portfolio through partnerships, joint ventures, consulting, financial investment, or advisory." The form does not disclose that "Cashflowpreneur" is Cashflowpreneurs LLC, that the LLC had been dissolved seven months earlier, that Zelan is unregistered, or that he had been sued for securities fraud in this Court.

32. On October 20, 2025, Zelan emailed Hayes from austin@westgatefund.com: "I see you have signed the agreement," and supplied Bank of America wire instructions in the name of Zelan Consulting. On November 3, 2025, Hayes wired $40,000 from his Navy Federal Credit Union account to Zelan Consulting at Bank of America.

**C. The Airplane and the Car**

33. The same day, November 3, 2025, Zelan emailed Hayes the "opportunity." He wrote that he had "just spoke[n] with Saad (our CEO)"; that "the $398k spot is indeed available for 25% of the Pilatus"; that Zelan would "personally own 50% of this plane because we know the track record of it and how it has performed for us in the past"; and that "the closing date is scheduled for Nov 24th." In the same message he offered a share of a Lamborghini Urus for $50,000 "for 30% of the car's profits." The email was sent from Washington and received in Georgia.

34. Every operative statement in that email was false, and Zelan knew it. "Saad" is Saad Basha, the principal of Air Fuga, a charter operator at Albert Whitted Airport in St. Petersburg, Florida, whose fleet includes a 2000 Pilatus PC-12. Zelan was not Air Fuga's officer, member, or owner; "our CEO" was a fiction. Zelan had signed a letter of intent in 2023 to acquire


ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

a minority interest in Air Fuga and, by Air Fuga's account, defaulted on it. On November 3, 2025 he held no title to, registered interest in, or enforceable right to any share of the PC-12 or any other aircraft. No aircraft is registered to Zelan, to any entity named in this Complaint, or to any address associated with him anywhere in the Federal Aviation Administration's registry. No closing was scheduled for November 24, 2025, and none occurred. The "Zelan Aviation" name under which he marketed aircraft investments exists in no registry.

35. Zelan also represented, in substance, that Hayes's interests would be documented; that the airplane and the car were or would promptly be placed in revenue service; that Hayes would receive periodic distributions proportional to his interest; that the investment was safe because it was backed by title to physical assets; and that Zelan had the experience and relationships to manage them.

36. Zelan did not disclose that he owned no part of either asset; that the Urus was financed in his own name and in default; that he intended to pay Hayes's money to other people, to his sales officer, to his own mortgage lender, and to his own car lender; that he was unregistered; that four of his entities were church corporations with no officers; that he had been sued for securities fraud in this Court; that he could not repay the principal if the promised income did not appear; or that the only exit he would ever offer was the substitution of a new investor.

37. On November 14, 2025, in reliance on these representations, Hayes wired $448,000 from his Navy Federal joint savings account to Zelan Consulting at Bank of America, N.A. (Navy Federal confirmation OPF15874623070). The funds came from his medical-malpractice settlement.

38. Hayes received nothing: no title, bill of sale, tail number, VIN, subscription agreement, operating agreement, escrow instruction, or certificate of any kind; no accounting, charter statement, or tax reporting; and no distribution of income, ever.

**D. Where the Money Went**

39. Zelan has since admitted in writing, under penalty of perjury, that none of Hayes's $398,000 was paid to Air Fuga, to Mr. Basha, or toward the aircraft. By his account, and on information and belief: on or about December 5 and December 10, 2025, approximately $221,085

was wired out of Zelan Consulting LLC's Bank of America account in six transfers ($89,450.99; $35,028.71; $16,101.62; $16,101.62; $32,201.03; and $32,201.03) to seven persons Zelan calls "participants," whose names he has redacted from every document he has produced; $35,000 was paid to Conley; approximately $62,000 was paid to Citadel Servicing to reinstate the defaulted mortgage on Zelan's own residence at 451 81st Avenue, St. Pete Beach, Florida; and approximately $80,000 was spent on "advertising, marketing, and travel." On January 2, 2026, $70,000 was paid to JPMorgan Chase's auto-finance unit to cure Zelan's personal default on the Lamborghini Urus he had financed in his own name in December 2022.

40. Zelan's first sworn account of these funds stated that the entire $398,000 had gone to the "participants." Only after Hayes demanded the wire records did Zelan correct that statement, reducing the amount attributed to the participants by $176,915 and admitting the payments to Conley, to his own mortgage lender, and to his own marketing and travel.

41. Hayes was never told that anyone else held a position in the airplane or would receive any part of his money. Zelan's November 3 email describes a transaction among Hayes, Zelan, and Air Fuga, not seven co-investors. Plaintiff alleges on information and belief, and in the alternative, that the December 2025 wires repaid earlier participants in Zelan's programs with Hayes's money, or were made to accounts controlled by Zelan, his family, or his associates. Either is actionable. The Bank of America records will show which.

**E. The Stall**

42. In January 2026, Zelan emailed Hayes a homemade "Monthly Statement" for the Urus reporting no income and charging Hayes a purported 30% share of tires, service, and "a monthly payment," totaling $3,579.69, with a note that there were "a few expenses to cover for the first month or so while we get this car up and running in the fleet." Hayes paid Zelan Consulting $1,800.00 by Zelle on January 22, 2026 and $1,779.68 on January 26, 2026. He was being billed for the expenses of a car he did not own, whose loan his own money had just cured.

43. On February 21, 2026, Hayes demanded his money back: "I need to get the money back." Zelan first claimed that "we've already made money with both assets." He then wrote: "Looking for people to replace your position in the jet and whenever I can sell off a portion I will

send you the money"; "Do you know anyone by any chance that may be interested in replacing even part of your position? $50k? $100k?"; and "They can wire the money directly to you actually." He sent a webinar link: "Please share it with your folks. This will be the fastest route to get your position replaced." In an audio message he offered to "do all the talking" if Hayes would invite people. Hayes recruited no one.

44. On or about May 24, 2026, Zelan texted Hayes from the sender "Dr. Austin": "We did the preliminary due diligence on the companies and are planning to send an official LOI (on which the fund will be based)"; "The transfer is still coming. I've been talking to the guy who transferred to BofA. They said they are holding funds because you disputed your transfer. The guy said he would send new funds in the meantime but that hasn't happened yet"; and "The sale of the jet is still pending as well. They are performing a camp inspection and next step is the mechanical inspection and test flight." No fund was formed, no LOI was produced, no transfer arrived, and Zelan owned no jet to sell. The message blamed Hayes for the delay and promised payment from "new funds" from another person.

45. In July and August 2026, corresponding from austin@westgatefund.com over the signature "Dr. Austin Zelan / Founder / Zelan Consulting," Zelan proposed to repay Hayes at $3,000 a month, rising over time, wrote that any faster schedule meant he "would almost certainly default immediately," refused any provision allowing entry of judgment on default, and claimed he had removed the $40,000 from the balance because he had "delivered on that fully through bi-weekly zoom calls with Mark." His only identified source of repayment was "100% of my qualifying net commissions as they are received" from "active aircraft brokerage transactions and a business acquisition." He did not propose to repay Hayes from the income of the airplane or the car, because there was none. Hayes has been repaid nothing.

46. Bank of America closed Zelan Consulting LLC's receiving account on or about April 30, 2026. In August 2026 Zelan entered a "Founder & CEO Partnership Agreement" with a snow-removal company whose owner's name he has redacted. By October 2026 he was proposing to repay Hayes $20,000 borrowed from his mother and $8,000 a month from that snow-removal venture, which has paid him nothing.


ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

**F. The Family and the Florida Company**

47. Zelan married Yelyzaveta Cherniienko on November 1, 2025. On March 19, 2026, four months after Hayes's $448,000 arrived, Ms. Zelan formed The Monegasque LLC in Florida, naming herself registered agent and signing as its member, with a principal office in St. Petersburg and a mailing address at 15325 SE 155th Place, Unit Y4, Renton, Washington, the address of Zelan Consulting LLC and of Zelan himself. In May 2026 the Monaco luxury magazine The Monegasque announced "The Monegasque Miami," its first licensed edition, with "Elizabeth Zelan" as Editor in Chief, and published its inaugural issue. In the same month Zelan's business debit card was used in Monaco, La Turbie, and Cagnes-sur-Mer on the French Riviera.

48. None of this appears in the sworn financial disclosure Zelan gave Hayes in September 2026, which identified a different company as his spouse's only business and swore that he held "no other interest in, or office with, any entity." A licensed luxury-magazine edition requires license fees, printing, staff, and events. Plaintiff alleges on information and belief that The Monegasque LLC and the Miami license were financed in whole or in part with money traceable to Hayes. Under RCW 26.16.210, where the good faith of a transaction between spouses is questioned, the burden of proof is on the party asserting good faith.

49. Zelan's parents hold the treasury. By Zelan's own account, his mother controls the accounts of Liberty One Alliance, Alpha Global Trust, and Alpha Global Corp., the church corporations through which investor money has moved since at least 2022, and in 2026 she caused payments from those accounts to him. She is the registered agent of Cashflowpreneurs LLC. The corporations sole publish no officers; the person who controls their accounts controls the enterprise's money.

50. Zelan's Florida residence at 451 81st Avenue, St. Pete Beach, is titled in his name, was in foreclosure in 2026, and carries a payoff of roughly $299,000 against a value he states at roughly $200,000. Approximately $62,000 of Hayes's money reinstated its mortgage. An insurance check of $124,152.54 from Monarch National Insurance on that property remains unnegotiated. Plaintiff seeks an equitable lien on the property and the proceeds to the extent of his funds applied to them. Florida's homestead exemption does not protect property acquired or

improved with funds obtained by fraud. Havoco of America, Ltd. v. Hill, 790 So. 2d 1018 (Fla. 2001).

**G. The Scheme in Sum**

51. The operation bears every mark of a Ponzi scheme. No investor has ever been paid income from any asset, because Zelan owns no income-producing asset. The only exit ever offered is a new investor to “replace” the old one. Repayment is always promised from future, unrelated inflows: commissions, a fund, “the guy,” new money. Insolvency is pleaded to victims while wealth is displayed to prospects. Settlements are signed to buy silence and are honored for a few installments. And the money of the newest investor goes, within weeks, to the people the operator owes and to the operator’s own house, car, wedding, and travel.

52. It also bears every mark of pig butchering. The victim is selected for the size of his capital and his personal vulnerabilities; he is cultivated over years; he is brought to a small first commitment that proves his liquidity; he is then sold a large position in an asset that exists only in the seller’s description; the salesperson who brought him is paid from the proceeds; and when he asks for his money, he is told it is coming, that a third party is holding it, that he caused the delay, and that he should bring his friends.

53. Zelan’s scienter is not in doubt. A person cannot innocently misstate whether he owns an airplane, whether he is a company’s CEO, or whether a closing is scheduled. He cannot innocently wire a new investor’s money to seven other people, his sales officer, and his own mortgage lender within seven weeks, then swear that all of it went to co-investors. He cannot innocently bill a victim for the expenses of a car whose loan the victim’s own money just cured. Zelan had been sued for securities fraud in this Court two years earlier for the same products. He knew.

**H. The Securities**

54. The interests sold to Hayes were securities. Hayes invested money in a common enterprise controlled by Zelan, in which his returns were to be pooled with those of other participants and derived from the operation of the aircraft and the automobile, and he was to receive profits solely from the efforts of Zelan and persons Zelan selected. He had no role in

acquiring, insuring, chartering, maintaining, or managing anything. The interests were investment contracts and securities under 15 U.S.C. § 77b(a)(1), 15 U.S.C. § 78c(a)(10), and RCW 21.20.005(17), and were also interests in a profit-sharing arrangement and fractional undivided interests in property. Zelan's own program agreement offers an "[o]pportunity to build a portfolio through partnerships, joint ventures, consulting, financial investment, or advisory" and recites that "[a]ll Investments involve some degree of risk."

**I. The Arbitration Clause Does Not Reach These Claims**

55. The Equity Boardroom Sales Agreement contains an arbitration clause. It governs disputes concerning the $40,000 program contract between Hayes and "Cashflowpreneur." The aircraft and automobile interests were sold two weeks later by Zelan personally and Zelan Consulting LLC, under no written agreement, to a counterparty not named in the program contract, and no Defendant other than the dissolved Cashflowpreneurs LLC is a party to that clause. Plaintiff's claims arising from the $448,000 and the January 2026 payments are not subject to arbitration, and Plaintiff pleads the $40,000 as damages and as part of the pattern without conceding that any claim is arbitrable.

## V. THE RICO ENTERPRISE AND THE PATTERN

56. At all relevant times Zelan, Zelan Consulting LLC, Cashflowpreneurs LLC, the four corporation-sole Defendants, Conley, and Does 1 through 10 constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Zelan Enterprise"), with the common purpose of obtaining money from members of the public by representing that it would be placed into identified income-producing assets, and of keeping it.

57. The enterprise has a structure. Zelan sits at its center and makes the operative representations. The brands "Cashflowpreneur," "Equity Boardroom," and "Zelan Aviation" supply the appearance of an institution. The registered entities supply names for bank accounts, mail domains, and signature blocks; the corporations sole supply accounts with no public owner. Conley and other salespersons supply reach and are paid from investor funds. Family members supply and control accounts. The enterprise has longevity: its entities were formed between 2017

and 2023, its marketing dates from at least 2022, and it was selling the same products in 2025 that were alleged to be fraudulent in 2023.

58. The enterprise is engaged in and affects interstate commerce. It solicited a Georgia resident from Washington; transmitted contracts and wire instructions across state lines; received interstate wires; maintained Colorado entities while operating from Washington; and moved proceeds to Florida.

59. Each Defendant is a person under 18 U.S.C. § 1961(3), distinct from the enterprise, and each conducted or participated in the conduct of its affairs: Zelan directed it; the entity Defendants furnished the names, domains, and accounts through which it contracted and received funds; Conley solicited and closed participants and was paid from their money; the Doe Defendants solicited, administered paperwork, and held accounts.

60. Defendants conducted the enterprise's affairs through a pattern of racketeering activity consisting of related acts of wire fraud, 18 U.S.C. § 1343, and mail fraud, 18 U.S.C. § 1341, each a use of interstate wires or mails to execute a scheme to defraud. The predicate acts include:

a. On or about September 28, 2022, the posting as "Austin Zelan | ADMIN" of a "5-10% per month" return representation and "50/50 profit split" on the enterprise's members' platform; in or about November 2022, the text-message transmission of wire instructions directing investor funds to the Bank of America account of Alphanance Global; and in or about November 2022, the electronic transmission of a "Westgate Fund" instrument designating an investor a "Silent participant." Pleaded on information and belief based on documents in Plaintiff's counsel's possession.

b. On or about October 20, 2025, the electronic transmission from Washington to Georgia of the Equity Boardroom Sales Agreement and of Zelan's email supplying Bank of America wire instructions for Zelan Consulting, inducing the $40,000 wire of November 3, 2025.



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

c. On November 3, 2025, the email from Washington to Georgia stating that Zelan had "just spoke[n] with Saad (our CEO)," that "the $398k spot is indeed available for 25% of the Pilatus," that Zelan would "personally own 50% of this plane," and that "the closing date is scheduled for Nov 24th," and offering a share of the Urus, inducing the $448,000 wire of November 14, 2025.

d. On or about December 5 and December 10, 2025, the six interstate wire transfers totaling approximately $221,085 from Zelan Consulting LLC's Bank of America account to seven undisclosed recipients; the transfer of $35,000 to Conley; the transfer of approximately $62,000 to Citadel Servicing; and on or about January 2, 2026 the transfer of $70,000 to JPMorgan Chase's auto-finance unit, each a use of the wires to distribute and conceal the proceeds of the scheme.

e. In January 2026, the email transmitting the homemade Urus "Monthly Statement" and soliciting $3,579.69 in purported expenses, inducing the Zelle payments of January 22 and 26, 2026.

f. On February 21, 2026, the messages stating that "we've already made money with both assets," proposing that new investors "replace" Hayes's position for "$50k" or "$100k," stating that "[t]hey can wire the money directly to you," and transmitting a webinar link as "the fastest route to get your position replaced."

g. On or about May 24, 2026, the text message stating that an "official LOI" was imminent, that "[t]he transfer is still coming," that a third party was "holding funds because you disputed your transfer," that "[t]he guy said he would send new funds," and that "[t]he sale of the jet is still pending."

h. On July 28, July 31, and August 3, 2026, the emails from austin@westgatefund.com transmitting installment proposals and "Commission Opportunities," representing that repayment would come from "active aircraft brokerage transactions and a business acquisition," and that the $40,000 had been "delivered on."

i. Throughout, the maintenance and use in interstate commerce of cashflowpreneur.com, westgatefund.com, westgatefund.circle.so, and the enterprise's social-media accounts to solicit participants.

61. The predicate acts are related: the same purpose, the same result, the same participants, the same class of victims, and the same methods. The pattern has closed-ended continuity, extending from at least September 2022 through August 2026, and open-ended continuity: fraud is the enterprise's regular way of doing business, its marketing remains live, and in 2026 Zelan was still promising repayment from new transactions and still seeking "replacement" investors.

62. Hayes was injured in his business and property by reason of the pattern, in the amount of $491,579.68, and is entitled under 18 U.S.C. § 1964(c) to threefold damages of $1,474,739.04, costs, and reasonable attorneys' fees.

## VI. CAUSES OF ACTION

Every Count asserted against Zelan is asserted against Zelan and the marital community composed of Zelan and Yelyzaveta Cherniienko Zelan. "Defendants" in Counts I through XI means Zelan, the marital community, Zelan Consulting LLC, Cashflowpreneurs LLC, the four corporation-sole Defendants, and Does 1 through 10; Counts II, III, V, VI, VII, VIII, XII, and XIII are also asserted against Conley. No Count other than XII and XIII is asserted against any Relief Defendant in that capacity.

**COUNT I — Securities Exchange Act § 10(b) and Rule 10b-5 (Against Defendants)**

63. Plaintiff incorporates the foregoing paragraphs.

64. In connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce, Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted material facts necessary to make the statements made not misleading, including each statement and omission described in Sections IV.C and IV.D; and engaged in acts, practices, and courses of business that operated as a fraud upon Hayes, in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

65. Defendants acted with scienter. Hayes relied on the misrepresentations and omissions in wiring $40,000 and $448,000 and in paying $3,579.68, and was damaged in the amount of $491,579.68. Zelan is additionally liable as the maker of each statement and as the person with ultimate authority over its content.

**COUNT II — Securities Act § 12(a)(1): Sale of Unregistered Securities (Against Defendants and Conley)**

66. Plaintiff incorporates the foregoing paragraphs.

67. Defendants offered and sold securities to Hayes using the means of interstate commerce. No registration statement was in effect or filed for those securities, and no exemption applied. Zelan solicited the purchases personally and for his own financial gain; Zelan Consulting LLC received the proceeds; the other entity Defendants and, on information and belief, Conley solicited the purchase, received the proceeds, or were nominal counterparties, each motivated by financial interest. Each is a statutory seller under 15 U.S.C. § 77l(a)(1). Hayes tenders the interests and is entitled to rescission and recovery of the consideration paid, $491,579.68, with interest, or damages in that amount.

**COUNT III — Securities Act § 12(a)(2) (Against Defendants and Conley)**

68. Plaintiff incorporates the foregoing paragraphs.

69. Defendants offered and sold securities by means of oral and written communications that included untrue statements of material fact and omitted material facts necessary to make the statements not misleading, including those described in Sections IV.C and IV.D. Defendants cannot sustain the burden of proving that they did not know, and in the exercise of reasonable care could not have known, of the untruths and omissions. Hayes is entitled to rescission or damages under 15 U.S.C. § 77l(a)(2).

**COUNT IV — Securities Exchange Act § 20(a): Control Person Liability (Against Zelan)**

70. Plaintiff incorporates the foregoing paragraphs.

71. Zelan directly or indirectly controlled each entity Defendant and was a culpable participant in each entity's violations of § 10(b) and Rule 10b-5. He is jointly and severally liable with each entity under 15 U.S.C. § 78t(a).


ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

**COUNT V — Civil RICO, 18 U.S.C. § 1962(c) (Against Defendants and Conley)**

72. Plaintiff incorporates the foregoing paragraphs, including Section V.

73. Each Defendant, being a person employed by or associated with the Zelan Enterprise, an enterprise engaged in and affecting interstate commerce, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through the pattern of racketeering activity described in Section V, in violation of 18 U.S.C. § 1962(c).

74. Hayes was injured in his business and property by reason of the violation in the amount of $491,579.68 and is entitled to threefold damages of $1,474,739.04, costs, and attorneys' fees under 18 U.S.C. § 1964(c).

**COUNT VI — RICO Conspiracy, 18 U.S.C. § 1962(d) (Against Defendants and Conley)**

75. Plaintiff incorporates the foregoing paragraphs, including Section V.

76. Each Defendant agreed with one or more other Defendants to conduct the affairs of the Zelan Enterprise through the pattern of racketeering activity described above, knowing its general nature and scope and agreeing to facilitate it. Zelan formed and directed each entity and made each representation; the entity Defendants let their names, domains, and accounts be used to receive and hold the proceeds; Conley solicited participants and accepted $35,000 of Hayes's money; the Doe Defendants solicited, prepared paperwork, and held accounts. Each committed at least one overt act in furtherance of the conspiracy. Hayes was injured as alleged and is entitled to threefold damages, costs, and attorneys' fees.

**COUNT VII — Washington State Securities Act, RCW 21.20 (Against Defendants and Conley)**

77. Plaintiff incorporates the foregoing paragraphs.

78. The interests sold to Hayes were securities under RCW 21.20.005(17), offered and sold in and from Washington. In connection with the offer and sale, Defendants employed devices, schemes, and artifices to defraud, made untrue statements of material fact and omitted material facts, and engaged in acts and practices that operated as a fraud, in violation of RCW 21.20.010; sold unregistered securities in violation of RCW 21.20.140; and acted as unregistered broker-dealers and salespersons in violation of RCW 21.20.040.


ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

79. Zelan is liable under RCW 21.20.430(1) as a seller and under RCW 21.20.430(3) as a control person and as a person who materially aided the sales; the entity Defendants and Conley are liable as sellers and material aiders. Hayes is entitled to rescission, the consideration paid with interest at eight percent per annum from the date of payment, costs, and reasonable attorneys' fees under RCW 21.20.430.

**COUNT VIII — Washington Consumer Protection Act, RCW 19.86 (Against Defendants and Conley)**

80. Plaintiff incorporates the foregoing paragraphs.

81. Defendants' conduct constituted unfair and deceptive acts and practices in trade or commerce under RCW 19.86.020: the sale of unregistered securities by unregistered persons; the misrepresentation of ownership of an aircraft and an automobile; the misrepresentation of income and track record; the use of a dissolved entity and of church corporations as counterparties; the use of unsupported credentials to induce trust; and the "replacement investor" exit. The conduct affects the public interest: Defendants solicited the general public through open advertising, used standard-form agreements, and have injured numerous other persons. Hayes was injured in his business and property, and is entitled to actual damages, treble damages up to the statutory maximum, costs, and attorneys' fees under RCW 19.86.090.

**COUNT IX — Fraud (Against Defendants)**

82. Plaintiff incorporates the foregoing paragraphs.

83. Defendants represented to Hayes the facts set out in Sections IV.C and IV.D, including the statements of the November 3, 2025 email. Each was a representation of existing material fact; each was false; Defendants knew each was false or made it recklessly; Defendants intended that Hayes rely; Hayes did not know the representations were false, had a right to rely on them, and did rely on them; and Hayes was damaged in the amount of $491,579.68. Defendants also concealed the material facts set out above, which they had a duty to disclose, with the same intent and effect. Hayes is entitled to compensatory damages and, because Defendants' conduct was willful and fraudulent, to such further relief as the law allows.


ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

**COUNT X — Negligent Misrepresentation (Against Defendants, in the Alternative)**

84. Plaintiff incorporates the foregoing paragraphs.

85. In the alternative to Count IX, Defendants supplied false information for Hayes's guidance in a business transaction, failed to exercise reasonable care in obtaining or communicating it, and intended or knew that Hayes would rely on it. Hayes justifiably relied and was damaged in the amount of $491,579.68.

**COUNT XI — Breach of Fiduciary Duty (Against Zelan and the Entity Defendants)**

86. Plaintiff incorporates the foregoing paragraphs.

87. A relationship of trust and confidence existed between Hayes and Zelan: Hayes paid $40,000 for private advisory access concerning "alternative asset investing and financial literacy"; Zelan undertook to identify investments for him, to acquire and manage assets on his behalf, and to hold and apply his money for that purpose; and Zelan knew Hayes's disability, his dependence on the settlement, and his lack of sophistication. Zelan and the entity Defendants breached that duty by taking Hayes's money for assets they did not own, applying it to their own obligations, and concealing both. Hayes was damaged in the amount of $491,579.68 and is entitled to damages, disgorgement, and an accounting.

**COUNT XII — Unjust Enrichment and Constructive Trust (Against All Defendants and All Relief Defendants)**

88. Plaintiff incorporates the foregoing paragraphs.

89. Hayes conferred a benefit of $491,579.68 on Defendants, who knew of it and retained it under circumstances that make retention inequitable. On information and belief, the Relief Defendants hold or have held property funded in whole or in part with money traceable to Hayes, for which they gave no value, including the accounts his mother controls, the St. Pete Beach property and its insurance proceeds, and The Monegasque LLC and its accounts. Defendants and Relief Defendants hold Hayes's funds, and all property and proceeds traceable to them, as constructive trustees for his benefit. Hayes is entitled to a constructive trust, an equitable lien, an accounting, and tracing over all such assets wherever held, including specifically the real property at 451 81st Avenue, St. Pete Beach, Florida and the Monarch National insurance proceeds, to the



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

extent of his funds applied to them, and the membership interests, accounts, and property of The Monegasque LLC.

**COUNT XIII — Fraudulent Transfer, RCW 19.40 (Against All Defendants, All Relief Defendants, and Doe Transferees)**

90. Plaintiff incorporates the foregoing paragraphs.

91. Hayes is a creditor of Zelan and the entity Defendants, and his claim arose from the wires of November 3 and November 14, 2025 and the payments of January 2026. After receiving his funds, Zelan and the entity Defendants transferred them with actual intent to hinder, delay, or defraud Hayes, and without receiving reasonably equivalent value while insolvent or rendered insolvent, in violation of RCW 19.40.041 and RCW 19.40.051. The transfers include, on information and belief: the December 5 and 10, 2025 wires of approximately $221,085 to seven undisclosed recipients; the $35,000 to Conley; the approximately $62,000 to Citadel Servicing for Zelan's Florida residence; the approximately $80,000 in marketing and travel; the $70,000 to JPMorgan Chase's auto-finance unit on January 2, 2026; transfers to or for the benefit of Ms. Zelan and The Monegasque LLC; and transfers to or through accounts controlled by Zelan's parents. The badges of fraud under RCW 19.40.041(2) are present: transfers to insiders, retention of control, concealment, transfers of substantially all assets, removal of assets to another state, insolvency, and transfers shortly after a substantial debt was incurred. As to Conley, the transfer is avoidable under RCW 19.40.041(1)(a) regardless of any antecedent debt, and in the alternative under RCW 19.40.051(2) as a transfer to an insider while Zelan was insolvent. Hayes is entitled to avoidance of the transfers, attachment and injunction under RCW 19.40.071, and judgment against each transferee under RCW 19.40.081.

## VII. PRAYER FOR RELIEF

Plaintiff requests judgment against Defendants, jointly and severally, and against the marital community of Marchel Austin Zelan and Yelyzaveta Cherniienko Zelan, as follows:

a. Rescission of the sales of securities and recovery of the consideration paid, $491,579.68, with prejudgment interest, under 15 U.S.C. § 77l and RCW 21.20.430, or in the alternative compensatory damages in that amount;



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

b. Threefold damages of $1,474,739.04 under 18 U.S.C. § 1964(c), together with costs and reasonable attorneys' fees;

c. Treble damages under RCW 19.86.090 to the statutory maximum, together with costs and attorneys' fees;

d. Interest at eight percent per annum from the dates of payment under RCW 21.20.430, and prejudgment and post-judgment interest as allowed by law;

e. A declaration that the obligations adjudged are community obligations enforceable against the community property of Marchel Austin Zelan and Yelyzaveta Cherniienko Zelan, including the earnings of both spouses;

f. A constructive trust, equitable lien, and accounting over all assets into which Plaintiff's funds can be traced, wherever held, including the real property at 451 81st Avenue, St. Pete Beach, Florida and the Monarch National insurance proceeds relating to it, the accounts of the corporation-sole Defendants and of Alpha Global Corp., and the membership interests, accounts, and property of The Monegasque LLC;

g. Avoidance of the transfers identified in Count XIII and judgment against each transferee, including Conley in the amount of $35,000 with interest;

h. Preliminary and permanent injunctive relief restraining Defendants and Relief Defendants from transferring, encumbering, or dissipating property traceable to Plaintiff's funds, and prejudgment writs of attachment and garnishment under Fed. R. Civ. P. 64 and RCW 6.25 and 6.26 on the grounds stated in RCW 6.25.030(5)–(8);

i. Leave to conduct expedited discovery under Fed. R. Civ. P. 26(d)(1) directed to the financial institutions, Air Fuga, Monarch National Insurance, Citadel Servicing, and The Monegasque LLC;

j. Disgorgement of all amounts by which Defendants were unjustly enriched;

k. Costs of suit and reasonable attorneys' fees under 18 U.S.C. § 1964(c), RCW 21.20.430, and RCW 19.86.090; and



ROSSI & CO. PC
616 33RD AVE NW | GIG HARBOR, WA 98335
303.222.0300 | RGR@VIHC.COM

l. Such other and further relief as the Court deems just and proper.

**VIII. JURY DEMAND**

92. Plaintiff demands trial by jury on all issues so triable.

DATED this 20th day of October, 2026.

ROSSI & CO., P.C.

By: s/ Ronald G. Rossi
Ronald G. Rossi, WSBA No. 54720
616 33rd Avenue NW
Gig Harbor, WA 98335
Telephone: (303) 222-0300
Email: rgr@vihc.com
Attorneys for Plaintiff Mark Hayes